UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Elizabeth M. Russell,
        Plaintiff,


      v.                                Civil Action No. 1:08-CV-91


Kathleen Sebelius, Secretary of the United States
Department of Health and Human Services,
        Defendant.


## REPORT AND RECOMMENDATION
(Docs. 15 and 21)


Plaintiff Elizabeth M. Russell brings this action against Defendant Kathleen

Sebelius, Secretary of the United States Department of Health and Human Services

("Secretary"), pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b)(1), seeking review of the

Secretary's decision denying Russell Medicare Part A home health care coverage for

skilled nursing services provided from June 26, 2004 through December 6, 2004.

Pending before the Court are Russell's Motion seeking an order reversing the Secretary's

decision (Doc. 15), and the Secretary's Motion seeking an order affirming the same (Doc.

21).

For the foregoing reasons, I recommend that Russell's Motion (Doc. 15) be

GRANTED, the Secretary's Motion (Doc. 21) be DENIED, and the case be

REMANDED for further proceedings.

## Background

### I.  Procedural History

Russell received home health services from the Visiting Nurse Association of Chittenden and Grand Isle Counties from June 26, 2004 through December 6, 2004 (hereafter "the service period").  Three coverage periods were comprised within this time frame:  June 26, 2004 through August 24, 2004; August 25, 2004 through October 23, 2004; and October 24, 2004 through December 6, 2004.[1]  Russell filed claims with Medicare's contracted fiscal intermediary, Associated Hospital Service ("AHS"), for reimbursement for the services provided, which claims were denied initially and upon reconsideration.  Thereafter, Maximus Federal Services, a Medicare qualified independent contractor, also issued unfavorable determinations.

Russell timely requested a hearing before an Administrative Law Judge ("ALJ"), which occurred via video teleconference on July 18, 2007.  (*See* Administrative Record ("AR") 896-924.)  On July 30, 2007, ALJ Brenda Etheridge Seman issued a decision denying Russell's consolidated claim on the grounds that Russell was not "home confined," within the meaning of the Medicare Act, during the service periods.  (AR 11-20.)  Russell requested review of the ALJ decision, and on February 15, 2008, the Medicare Appeals Council ("MAC") adopted the decision.  (AR 3-4.)

On June 10, 2008, having exhausted all administrative remedies, Russell filed a Complaint against the Secretary, initiating this action.

---

[1] These three coverage periods were consolidated in the ALJ's decision, and will similarly be consolidated into one service period by this Court.

## II.    Medical History

During the service period, Russell was approximately 67 years old, and was receiving home health services primarily for care of a non-healing surgical wound that resulted from hernia repair surgery which occurred on January 20, 2004.  (AR 12, 17, 166-67, 452-53, 781-82.)  Russell's major health issues following the surgery were as follows: she had a large, non-healing wound which ultimately required a skin graft almost one year after the initial surgery (AR 25, 543, 587, 804, 836); she fatigued easily, to the point of needing a blood transfusion (AR 25, 285, 503, 525, 527, 533, 535, 539, 587); and she experienced nausea, abdominal pain and swelling, and arthritic hip pain after ambulating (AR 239, 479, 525, 527, 529, 543, 569, 573, 587, 597, 603, 605, 609, 611, 816, 820.)  Additionally, Russell suffered from hypertension "affecting daily functioning" and requiring "ongoing monitoring," pure hypercholesterolemia, and esophageal reflux.  (AR 168-69, 781, 789-90.)  As a result of her pain, Russell was prescribed the painkiller Vioxx (AR 453, 543), before switching to the painkillers Celebrex and Bextra in October 2004 (AR 479, 599, 605, 611, 782, 816, 820).

The bulk of Russell's medical care during the service period consisted of daily nurse visits for management and evaluation of Russell's wound, including assessment and documentation of the wound's size, color, granulation, odor, and drainage in "Wound Assessment Flow Sheets."  (*See, e.g.,* AR 295-307; 920-21.)  Additionally, in September 2004, Russell's treating physician, Dr. Borrazzo, ordered an MRI due to a "protrusion" on the right side of Russell's abdomen.  (AR 543.)  Also in September 2004, as mentioned above, Dr. Borrazzo scheduled a skin graft for November 2004.  (*Id.*)

On July 15, 2004, Dr. Borrazzo signed a Home Health Certification and Plan of Care ("Certification") in which he noted that, although Russell required services for "wound care daily," her "[p]ain is now minimal, wound bed with healthy granulation tissue, cont[inues] to have mod[erate] amount of drainage." (AR 166.) Dr. Borrazzo further noted in the July 2004 Certification that Russell "continues to fatigue easily but has been trying to increase ambulation." (*Id.*) On September 2, 2004, Dr. Borrazzo signed a second Certification, wherein he ordered continued "daily" wound care, but indicated that Russell's wound was "decreasing in size slowly." (AR 452.) Finally, on November 4, 2004, Dr. Borrazzo signed a third Certification, wherein he again ordered "daily" wound care, but restated that the wound was "decreasing in size" and that there was "healthy granulation tissue present." (AR 781.) Dr. Borrazzo noted in the November 2004 Certification that there was an "[i]rregular shape" on the right side of Russell's wound, and that there was "bulging" and it was "sometimes tender." (*Id.*) The Doctor further noted that Russell was experiencing "nausea assoc[iated] with eating[,] and feeling pain hard mass above wound." (*Id.*)

Russell and her sister, Joyce Hojohn, submitted Affidavits to the ALJ. (*See* AR 25-28.) Therein, they state that, from June 2004 through the end of the service period, Hojohn visited Russell three to four times each day to check on Russell, complete household chores at Russell's home, and care for Russell's dog. (AR 25, 27.) Hojohn's residence was located approximately 50 feet from Russell's, "across the backyard and through a gate." (AR 25.) Russell and Hojohn further state in their respective Affidavits that, during the relevant time period, Hojohn took Russell grocery shopping at Shaw's

once or twice a month and to Big Lots to buy discounted canned goods once a month, for about 20 to 60 minutes per trip, with Hojohn doing all the driving, lifting, and carrying. (AR 25, 27.)  In her Affidavit, Russell states that after these trips, she would come home feeling exhausted and needing to lay down and rest.  (AR 25.)  Finally, Russell and Hojohn state in their respective Affidavits that, beginning in July 2004, when the weather was nice, Russell would walk with Hojohn while Hojohn walked Russell's dog for a distance of approximately 50 feet.  (AR 25, 27.)  According to Russell and Hojohn, these short dog walks, as well as the 20- to 60-minute trips to the supermarket and to Big Lots a couple of times a month, were the only trips Russell took outside her home during the service period, other than when Hojohn or Russell's son took Russell to medical appointments.  (*Id.*)  There is no evidence in the record that Russell attended any religious services or social engagements, or visited any stores other than the supermarket and Big Lots, during the service period.

## Standard of Review

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. § 1395 *et seq.*, establishes the federal government's program of health insurance for the elderly.  *Connecticut Dep't of Soc. Servs. v. Leavitt*, 428 F.3d 138, 141 (2d Cir. 2005).  The remedial purpose of the Medicare Act requires that it be broadly construed. *Gartmann v. Sec'y of Dept of Health and Human Servs.*, 633 F. Supp. 671, 679 (E.D.N.Y. 1986), *disagreed with on other grounds in New York ex rel. Bodnar v. Sec'y of Health and Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990).  "Care must be taken 'not to disentitle old, chronically ill and basically helpless, bewildered and confused people . . .

from the broad remedy which Congress intended to provide our senior citizens.'" *Id.*

(quoting *Ridgley v. Sec'y of Dep't of Health, Educ. and Welfare*, 345 F. Supp. 983, 993

(D. Md. 1972)). Nonetheless, claimants have the burden of proving their entitlement to

Medicare benefits. *Friedman v. Sec'y of Dept of Health and Human Servs.*, 819 F.2d 42,

45 (2d Cir. 1987).

Medicare has two parts, Parts A and B. Medicare Part A is automatic and

premium-free; it provides reimbursement for inpatient hospital services, post-hospital

extended care services, home health services, and hospice care. *See McCreary v. Offner*

172 F.3d 76, 78 (D.C. Cir. 1999) (citing 42 U.S.C. §§ 1395c-i). Medicare Part B is a

voluntary supplemental program that covers medical and other health care services. 42

U.S.C. §§ 1395j-x. This dispute concerns payment for home health services under

Medicare Part A. *See* 42 U.S.C. § 1395d(a)(3).

The Medicare program is administered through private contractors by the Centers

for Medicare and Medicaid Services ("CMS"), which is part of the United States

Department of Health and Human Services ("HHS"). 42 U.S.C. §§ 1395h, 1395u. The

contractors (usually insurance companies) are responsible for making an initial

determination on claims under Parts A or B on the basis of regulations and other policies

articulated by the Secretary. 42 U.S.C. § 1395ff(a)(1). Contractors responsible for

making coverage determinations regarding skilled nursing services are referred to as

"fiscal intermediaries." When a claim is filed, a fiscal intermediary, in this case AHS,

makes an initial determination regarding whether to pay the claim on the basis of the

information provided by the skilled nursing facility, in this case the Visiting Nurse

Association of Chittenden and Grand Isle Counties. 42 U.S.C. § 1395ff(a)(1); 42 C.F.R.

§ 405.904(a)(2). If the claimant is dissatisfied with the intermediary's initial

determination, he or she is entitled to request a redetermination by the intermediary, *see*

42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940, and then a redetermination by a qualified

independent contractor ("QIC"), in this case Maximus Federal Services, *see* 42 U.S.C. §

1395ff(c)(3)(B)(i); 42 C.F.R. § 405.968.

      If the claimant is dissatisfied with the decision of the QIC, and the amount in

controversy exceeds a certain threshold amount, the claimant may request a hearing

before an ALJ. 42 U.S.C. § 1395ff(d)(1); 42 C.F.R. §§ 405.1000, 405.1002. At that

hearing, the claimant has an opportunity to submit new evidence, and, if the intermediary

elects to participate in the hearing, the claimant may conduct discovery. 42 C.F.R. §§

405.1018, 405.1036, 405.1037. If the claimant is dissatisfied with the ALJ's decision, he

or she may appeal to the Medicare Appeals Council ("MAC"). 42 U.S.C. § 1395ff(d)(2);

42 C.F.R. §§ 405.902, 405.1100. Finally, the MAC issues a decision, which is subject to

review in federal court, *see* 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1130,

405.1136, if the amount in controversy is at least $1,000, adjusted for inflation, *see* 42

U.S.C. § 1395ff(b)(1)(E)(i); 42 C.F.R. § 405.1006(c).

      The Medicare statute unambiguously vests final authority in the Secretary, and no

one else, to determine whether reimbursement for services should be made. *Bodnar*, 903

F.2d at 125 (citing 42 U.S.C. § 1395ff(a); *Heckler v. Ringer*, 466 U.S. 602, 617 (1984)

("The Secretary's decision as to whether a particular medical service is 'reasonable and

necessary' and the means by which she implements her decision . . . are clearly

7

discretionary decisions.")).  In evaluating a claim for payment, the Secretary must

determine whether the relevant services satisfy the fundamental requirement of 42 U.S.C.

§ 1395y(a), which requires that the services be "reasonable and necessary for the

diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A); *see New York ex*

*rel. Holland v. Sullivan*, 927 F.2d 57, 58-59 (2d Cir. 1991).  This statutory standard gives

the Secretary "wide discretion" to determine whether the numerous medical services and

items covered by Medicare are reasonable and necessary in particular circumstances.

*Willowood of Great Barrington, Inc. v. Sebelius*, 638 F. Supp. 2d 98, 105 (D. Mass.

2009) (citing *Goodman v. Sullivan*, 891 F.2d 449, 450 (2d Cir. 1989)).

To accomplish the task of administering the reasonable and necessary standard,

the Secretary acts through formal regulations and informal program manuals.  *Willowood*,

638 F. Supp. 2d at 105.  "In situations in which the meaning of regulatory language is not

free from doubt, the reviewing court should give effect to the [Secretary's] interpretation

so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the

purpose and wording of the regulations."  *Visiting Nurse Ass'n Gregoria Auffant, Inc. v.*

*Thompson*, 447 F.3d 68, 72-73 (1st Cir. 2006) (citing *Martin v. Occupational Safety &*

*Health Review Comm'n*, 499 U.S. 144, 150-51 (1991) (internal citations and quotations

omitted)).  However, pronouncements in manuals like the Medicare Provider

Reimbursement Manual ("PRM"), which do not have the force of law, are entitled to

"less deference than an interpretation arrived at after a formal adjudication or notice-and-

comment rulemaking."  *Visiting Nurse Ass'n Gregoria Auffant*, 447 F.3d at 73 (citing

*Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

Like the Commissioner's determination of whether a claimant is disabled under the Social Security Act, the Secretary's determination of whether services are reasonable and necessary under the Medicare Act must be based on substantial evidence and be in accordance with correct legal principles. *See* 42 U.S.C. § 405(g); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gartmann*, 633 F. Supp. at 679 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence exists, the reviewing court analyzes the record as a whole, meaning that, "in assessing whether the evidence supporting the Secretary's position is substantial, [courts] will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it." *Bodnar*, 903 F.2d at 126 (citing *St. Elizabeth Cmty. Hosp. v. Heckler*, 745 F.2d 587, 592 (9th Cir. 1984)).

While the reviewing court must defer to the Secretary's supported findings of fact, it "is not bound by the Secretary's conclusions or interpretations of law, or an application of an incorrect legal standard." *Gartmann*, 633 F. Supp. at 679. Therefore, "'[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards.'" *Id.* at 680 (quoting *Klofta v. Mathews*, 418 F. Supp. 1139, 1142-44 (E.D. Wis. 1976)); *see Bergeron v. Shalala*, 855 F. Supp. 665, 667 (D. Vt. 1994).

**ALJ Decision**

In this case, as noted above, the ALJ determined that Russell was "not home confined" on the dates of service. (AR 12.) In support of this determination, the ALJ noted that Russell's home health care was furnished "primarily for continued surgical wound treatment," and that, according to the plan of care notes, the wound was decreasing in size; the wound bed "reflected healthy granulation, with a moderate amount of drainage;" and Russell's pain was "minimal." (AR 18.) Summing up the evidence regarding the condition of Russell's wound, the ALJ stated: "In sum, the status of [Russell's] wound site was such that it did not significantly impair her ability to leave the home." (*Id.*)

Next, the ALJ considered Russell's "general condition" during the service period, summarizing the relevant OASIS assessments as follows:

> [Russell] was noted to never be short of breath. She had normal cognitive status, she was continent, and she was independent for her ADLs. In pertinent part, the patient assessment reflects that she was able to use a bus or handicapped van to leave the house. She could ambulate without an assistive device. She was able to go shopping with minimal assistance. Finally, the assessment expressly indicates that the patient was not homebound.

(AR 18.) From these facts, the ALJ concluded that Russell was "capable of leaving the home for extended periods of time for nonmedically related activities, such as shopping." (*Id.*) The ALJ further concluded that Russell's level of functionality and ability to travel without an assistive device "suggests that leaving the home did not require a considerable and taxing effort." (*Id.*) Thus, the ALJ determined that the home health services provided to Russell during the service period were not covered by Medicare Part A. (*Id.*)

## <u>Analysis</u>

Reimbursement for home health services is contingent upon a showing that the claimant is confined to the home, under the care of a physician, in need of skilled services, and under a plan of care.  42 C.F.R. §§ 409.42(a)-(d).  In relevant part, the regulations state as follows:

> To qualify for Medicare coverage of home health services, a beneficiary must meet each of the following requirements:
>
> (a)  Confined to the home.  *The beneficiary must be confined to the home* or in an institution that is not a hospital, SNF or nursing facility . . . .
>
> (b)  Under the care of a physician.  The beneficiary must be under the care of a physician who establishes the plan of care. . . .
>
> (c)  In need of skilled services.  The beneficiary must need at least one of the following skilled services as certified by a physician in accordance with the physician certification and recertification requirements for home health services under § 424.22 of this chapter.
>
> . . .
>
> (d)  Under a plan of care.  The beneficiary must be under a plan of care that meets the requirements for plans of care specified in § 409.43.

*Id.* (emphasis added).

The only disputed issue in this case is whether Russell was confined to her home, as defined in the Medicare Act, during the service period.   Under the Medicare Act, an individual is considered to be "confined to [her] home" if she has a condition "that restricts [her] ability . . . to leave . . . her home except with the assistance of another individual or the aid of a supportive device (such as crutches, a cane, a wheelchair, or a walker), or if the individual has a condition such that leaving . . . her home is medically

contraindicated." 42 U.S.C. § 1395f(a). The claimant "does not have to be bedridden to be considered 'confined to home,'" but she should have a "normal inability to leave home," and leaving home should require "a considerable and taxing effort." *Id.* Absences from the home for medical purposes, including the receipt of health care or therapeutic treatment, do not disqualify a claimant from being considered "confined to home." *Id.* Moreover, non-medical absences which are "infrequent or of relatively short duration" do not disqualify a claimant from being considered "confined to home." *Id.*; *see also Burgess v. Shalala*, No. 5:92-CV-158, 1993 WL 327764, at *4 (D. Vt. June 10, 1993); *Labossiere v. Sullivan*, No. 90-CV-150, 1991 WL 531922, at *4 (D. Vt. July 25, 1991).

A two-part test is used to determine whether a claimant is "confined to home," also referred to as "homebound." First, the Secretary must determine "whether the claimant's condition is such that trips outside the home either: (a) require the aid of another individual or an artificial device, *or* (b) are medically contraindicated." *Burgess*, 1993 WL 327764, at *4 (emphasis in original). In this case, the dispute revolves solely around the first prong of the first item - whether Russell required the aid of another individual to leave her home. If either element is met, the Secretary next must determine "whether trips outside the home: (a) require a considerable and taxing effort, *and* (b) are infrequent, of a short duration, or are attributable to medical treatment." *Id.* (emphasis in original); *see Dennis v. Shalala*, No. 5:92-CV-210, 1994 WL 708166, at *3 (D. Vt. Mar. 4, 1994). This Court has explained that, given Congress' decision to define the phrase "confined to home" to include claimants who are able to travel outside the home "'on an

infrequent basis for such non-medical purposes as an infrequent family dinner, an occasional drive or walk around the block, or a church service[,]' [t]he obvious thrust is that the definition of 'confined to home' should not serve to imprison the elderly by creating the penalty of a loss of Medicare benefits for heroic attempts to live a normal life." *Burgess*, 1993 WL 327764, at \*4, n. 4 (quoting H.R.Rep. No. 100-391(I), 100th Cong., 1st Sess., *reprinted in*, 1987 U.S.C.C.A.N. 2313-228).

Russell argues that she met the legal standard of being "confined to home" during the service period, and that the record lacks substantial evidence to support the ALJ's determination to the contrary. Specifically, Russell contends that she required the assistance of another person to leave her home, and that leaving the home required considerable and taxing effort due to her nausea, abdominal pain, hip pain, anemia, and fatigue. Russell further contends that her non-medical absences from the home were infrequent and of relatively short duration, and that the ALJ's failure to make a finding on this issue was legal error. The Secretary counters that clinical evidence, including nurse notes stating that Russell was able to leave the home "independently," demonstrates that Russell was not confined to her home; and that the ALJ used the proper standards in making this determination.

Having considered both parties' arguments and the evidence as a whole, I find that the ALJ neglected to resolve conflicts in the evidence, ignored probative evidence, and misapplied the law. Taken individually, each of these errors could be considered harmless; but taken together, they are significant. Therefore, for the reasons discussed below, I recommend remanding for a re-weighing of the evidence and a new decision.

I.    **The ALJ Failed to Weigh the Evidence and Make Credibility Determinations.**

A.    **Conflicting Nurse Notes**

Despite the Secretary's detailed analysis in her Motion, the ALJ decision does not include a weighing and balancing of conflicting and probative nurse notes. Instead, the decision merely states: "[T]he assessment expressly indicates that the patient was not homebound." (AR 18.)  The decision fails to note that, although it is true that there are assessments in the record which state that Russell was able to leave her home "independently" (*see, e.g.,* AR 209, 223, 237, 587, 603, 816), there are also assessments in the record which state that Russell was "homebound" (*see, e.g.,* AR 255, 289, 565, 804, 842).

Specifically, in a progress note dated June 22, 2004,[2] registered nurse Pegge Shepard recorded that Russell's surgical wound was "looking good," and that Russell was "independent" with respect to ADLs,[3] required "family assist" with IADLs,[4] and "leaves home independently for app[ointment]s [and] grocery shopping." (AR 173.) Generally, notes from Nurse Shepard state that Russell was able to ambulate short

---

[2] Hereafter, all dates mentioned refer to the year 2004, unless indicated otherwise.

[3] "ADLs" is the abbreviation for "activities of daily living," which are defined as: "[e]veryday routines generally involving functional mobility and personal care, such as bathing, dressing, toileting, and meal preparation." STEDMAN'S MEDICAL DICTIONARY 30, 22 (28th ed. 2006). There does not appear to be any question that Russell was able to independently perform ADLs, without assistance from others, during the service period.

[4] "IADLs" is the abbreviation for "instrumental activities of daily living," which are defined as: "more complex and demanding activities of daily living required for more independent living[,] . . . includ[ing] using the telephone, traveling, *shopping*, preparing meals, doing housework, taking medications properly, and managing money." STEDMAN'S MEDICAL DICTIONARY 942, 1724 (28th ed. 2006) (emphasis added). As noted above, there is conflicting evidence regarding whether Russell was able to independently perform IADLs – specifically, grocery shopping – during the service period.

distances and leave home "independently" for grocery shopping, "errands," visiting family and friends, and "appointments." (*See, e.g.,* AR 173, 179, 181, 183, 187, 195, 209, 223, 237, 265, 285, 293, 505, 800, 810, 820, 834.)

There are many nurse notes, however, which conflict with Nurse Shepard's notes. For example, in a progress note dated July 28, registered nurse Susan Miller-[ ] (last name illegible) recorded that Russell was experiencing pain which was "keeping her awake at night." (AR 239.) And in a note dated August 4, registered nurse Hannah M. [ ] (last name illegible) recorded that Russell was performing IADLs, but only "[with] some assist[ance] from family." (AR 251.) Notes from several other nurses, including Nurse Shepard, recorded on various dates, similarly reflect that Russell required "assist[ance]" from her "family," her "sister," or her "sons" to perform IADLs. (AR 181, 195, 209, 237, 251, 559, 834, 836.) Moreover, in notes dated August 6 and November 5, respectively, registered nurse L. Nadeau recorded that Russell was able to leave her home only to attend medical appointments. (AR 255, 842.) And in a note dated August 22, registered nurse Mary Clifford recorded that, although Russell was "able to do [her] own ADLs," she was "[h]omebound [secondary] to wound." (AR 289.) Finally, in a September 25 note, the same nurse again stated that Russell was "[h]omebound [secondary] to open wound." (AR 565.)

"Although it is clearly within the ALJ's statutory authority to choose whom to credit when witnesses give conflicting testimony, the ALJ 'cannot reject evidence for no reason or the wrong reason.'" *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981)). Before disregarding

relevant medical evidence, the ALJ must weigh the conclusions made therein against the other relevant evidence "'and explain why certain evidence has been accepted and why other evidence has been rejected.'" *Carter v. Railroad Ret. Bd.*, 834 F.2d 62, 65 (3d Cir. 1987) (quoting *Kent v. Schweiker*, 710 F.2d 110, 115, n. 5 (3d Cir. 1983)). The Third Circuit explained: "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d at 706-07 (internal citation omitted).

Clearly, nurse notes stating that Russell left her home "independently" during the service period are highly probative with respect to whether Russell met the Medicare Act's definition of "confined to home." But nurse notes stating that Russell was unable to leave her home without assistance from family are equally probative, and they were not mentioned in the ALJ decision. The conflicts among nurse notes regarding Russell's ability to leave the home during the service period, reflect that either: (a) different nurses had different opinions as to Russell's capabilities and actions during the service period, with respect to leaving her home; or (b) each nurse had her own unique definition of the terms "homebound," "housebound," and/or "independent," which definition may have

differed from that prescribed in the Medicare Act.[5]  A review of the evidence as a whole demonstrates that the latter option is likely.

There is reason to believe Nurse Shepard's definition of "independently" may have meant that Russell could leave her home without a supportive device but not without the assistance of another individual.  (As noted above, both individuals who require a supportive device *and* those who require the assistance of another person to leave the home are considered "confined to home" under the Medicare Act.)  This is evidenced by Nurse Shepard's recording, on the one hand, that Russell left the home "independently for . . . grocery shopping" (AR 173; *see also* AR 810), while on the other hand recording that Russell was "[a]ble to go shopping, but needs some assistance" (AR 170; *see also* AR 795) and that Russell required "family assist" to perform IADLs (*see, e.g.*, AR 173, 179, 181, 195, 209, 237).  Given that "shopping" is considered an IADL, *see,* STEDMAN'S MEDICAL DICTIONARY 942, 1724 (28th ed. 2006), Nurse Shepard's

---

[5] In her Motion, Russell effectively draws the Court's attention to a 2002 study conducted by the Department of Health and Human Services which found that many nurses have personal definitions of the word "homebound" that differ from the Medicare Act's definition of being confined to home.  Angela G. Brega, et al., *Study of Medicare Home Health Practice Variations: Final Report*, http://aspe.hhs.gov/daltcp/reports/epic.htm (August 2002).  In relevant part, the study states:

> [T]he definition of "homebound" differed substantially among nurses.  Some participants interpret homebound to mean that a patient cannot leave his or her home under any circumstances.  Other nurses reported that a homebound patient is one who is able to leave the home only with taxing effort.  One participant suggested that, to be considered homebound, a patient could not leave the home for socialization or shopping, but that attendance at church, doctor's visits, and appointments with the hairdresser were acceptable.  This nurse stated that a patient does not "have to be stretched out in bed to be considered homebound."  Participants agreed that patients who are able to drive are not homebound, even if there are medical contraindications, the patient's disease process is uncontrolled, or there are influencing psychosocial factors. . . .  Note that, according to Medicare coverage rules, the ability to drive is not a definitive indication that a patient is not homebound.

recordings are internally incompatible, unless she considered shopping "independently" to include shopping with the assistance of a family member (but without a supportive device). Another indication that Nurse Shepard's definition of "independent" may have meant that Russell could leave her home, but not without the assistance of another individual, is the fact that, in many of her notes, Nurse Shepard wrote "self" next to "ADLs" and "ind[ependent]" next to "IADLs." (*See, e.g.,* 479, 503, 533, 587, 603, 816.)[6] It can be deduced from these notes that the terms "self" and "independent" meant different things to Nurse Shepard, and further, that perhaps by writing "self" next to "ADLs," the Nurse was noting that Russell was able to perform activities of daily living on her own without any assistance from others, but by writing the different term "independent" next to "IADLs," she was noting that, although Russell was able to perform activities like shopping without an assistive device, she was unable to perform them without the assistance of others.

In sum, the ALJ's determination that Russell was confined to home was principally based on Nurse Shepard's notes stating that Russell left the home "independently." Despite this fact, the ALJ engaged in no analysis regarding how the Nurse was defining that term, and did not mention or discuss the fact that other nurses appear to have been defining the term differently. Nor did the ALJ engage in any

---

[6] It is noteworthy that, in other notes, Nurse Shepard wrote "self" next to both "ADLs" and IADLs" (*see, e.g.,* AR 505, 519), perhaps reflecting that on some days Russell appeared to the Nurse to be more self-sufficient in her IADLs than on other days, or, alternatively, indicating that the Nurse's notes were sloppily and/or inconsistently prepared. Also noteworthy, in one of Nurse Shepard's notes, the Nurse records "self" next to "ADLs" and "family - self" next to "IADLs" (*see* AR 834), again possibly reflecting the Nurse's belief that Russell was able to perform ADLs more independently than she was able to perform IADLs, such as shopping.

analysis regarding why she chose to adopt Nurse Shepard's notes regarding Russell's ability to leave the home, as opposed to the conflicting notes of other nurses. It is not for the court to engage in this credibility analysis in the first instance; the ALJ should have weighed the credibility of this important and probative evidence, and made findings as to which nurse notes were more credible and why. Moreover, as explained above, it is unclear from the record what Nurse Shepard meant by her recordings, and the ALJ should have considered the possibility that, based on how Nurse Shepard defined the terms "self" and "independently," the Nurse's statements could be consistent with Russell's testimony that her sister accompanied her on trips to the supermarket and either her sister or her son accompanied her to medical appointments.

### B.     Affidavits of Russell and Hojohn

As described above, the Affidavits of Russell and her sister, Joyce Hojohn, unambiguously state that during each of Russell's non-medical trips outside the home during the service period, she was accompanied (and assisted) by her sister. Specifically, Russell states that she left her home during the service period only to go grocery shopping (at Shaw's or Big Lots) with Hojohn, or to accompany Hojohn when she took Russell's dog for a 50-foot walk. (AR 25, 27.) The Affidavits specify that the trips to Shaw's occurred once or twice a month, and the trips to Big Lots occurred once a month, and that the trips never exceeded 60 minutes in duration. (*Id.*)

The only evidence that Russell left home for any other purpose, excluding medical appointments, is Nurse Shepard's statements in her assessments that Russell left home for "visiting friends," for "visiting" generally, and for "visiting family." (*See, e.g.,* AR 800,

810, 820, 834.)  But Nurse Shepard does not provide any detail as to whom Russell was visiting with, for how long, and how frequently.  Moreover, no other nurse mentions Russell's "visits" with friends or family.  Perhaps Nurse Shepard's recording of Russell's "visits" with family and friends referred to Russell and Hojohn's trips to the supermarket or 50-foot dog walks.  Alternatively, Nurse Shepard could have been referring to visits she believed Russell was having with her sister at her sister's home, which was located across the backyard and approximately 50 feet from Russell's home.  But there is no other evidence that such visits at Hojohn's home occurred during the service period.  Moreover, if the ALJ had concluded that Russell had visited Hojohn at Hojohn's home during the service period, she necessarily would have had to find that the Affidavits of Russell and Hojohn, which specifically refute the existence of such visits, lacked credibility.  The ALJ did not make this finding in her decision; in fact, the decision makes no reference at all to the Affidavits.

The ALJ erred both in failing to mention the discrepancy between Nurse Shepard's recordings and Russell and Hojohn's respective Affidavits, and in failing to make findings regarding which evidence was more credible.  "The ALJ is required to set forth 'not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"  *Barreto ex rel. Rivas v. Barnhart*, No. 02 Civ. 4462, 2004 WL 1672789, at *5 (S.D.N.Y. Jul. 27, 2004) (quoting *Cotter v. Harris*, 642 F.2d at 705); *see also Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (ALJ's credibility

findings must be set forth "with sufficient specificity to permit intelligible plenary review of the record"); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) ("[A] minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position."); *Thorp v. Apfel*, No. 97-809H, 1998 WL 683767, at **4-5 (W.D.N.Y. Sep. 17, 1998) (ALJ erred in failing to provide an explanation as to whether he considered the probative value of the written statements of two lay witnesses); *Meyer v. Schweiker*, 549 F. Supp. 1242, 1247 (W.D.N.Y. 1982) ("When an administrative law judge discredits an applicant[']s testimony, [he or she] must articulate the reasons for doing so.").

If the ALJ disbelieved Russell's and Hojohn's testimony about Russell's pain, fatigue, ability to leave the home independently, and actual trips outside the home during the service period, she should have said so and explained why. *See Chiappa v. Sec'y of Dep't of Health, Educ., and Welfare*, 497 F. Supp. 356, 361 (S.D.N.Y. 1980). Although Russell's representative read large portions of Russell's and Hojohn's respective Affidavits to the ALJ at the administrative hearing (*see* AR 902-06), the ALJ's failure to mention them in her decision "could lead to a conclusion that [s]he neglected to consider [them] at all." *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). In the disability context, courts have held that, "[i]n addition to objective medical facts and expert medical opinions, the Hearing Examiner must consider the claimant's subjective evidence of pain and disability, as corroborated by family and neighbors . . . ." *Mode v. Celebrezze*, 359 F.2d 135, 136 (4th Cir. 1966). The rationale behind this rule is that reviewing courts must know the basis for ALJ decisions so they can properly exercise

their responsibility under the law. *Chiappa*, 497 F. Supp. at 362. The Second Circuit explained that, in cases where the ALJ fails to explicitly state whether he or she believed the claimant's testimony, the court cannot uphold the ALJ's ruling because it is "at a loss to discern the ALJ's rationale for his determination." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1984).

This Court can think of no reason why this rule and rationale should not also apply in the Medicare context, and more specifically, with respect to Medicare patients' written affidavits regarding their pain, fatigue, and inability to leave home without the assistance of others and actual practice of leaving home (or not leaving home) during the relevant period. ALJs are not required to evaluate in writing every piece of testimony and evidence submitted, but they are required to make "a minimal level of articulation" as to their "assessment of the evidence . . . in cases in which considerable evidence is presented by the claimant." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id.* In this case, the Court is unable to trace the path of the ALJ's reasoning, and in fact, it appears that the ALJ improperly disregarded Russell's and Hojohn's Affidavits in favor of almost exclusive reliance on the written notes of one nurse (Nurse Shepard).

Because the ALJ failed to adequately analyze the significantly probative conflicting evidence, including Russell's and Hojohn's Affidavits and nurse notes stating that Russell was "homebound" on the one hand and Nurse Shepard's notes stating that Russell independently left her home to visit friends and family on the other hand, remand

is appropriate so that the ALJ can (a) properly weigh and balance all the evidence; (b) explain which parts of the record she relied on and which she rejected in making her determination, and why; and (c) if necessary, conduct further proceedings to better develop the record. *Id.*

## II. The ALJ Applied an Erroneous Legal Standard in Assessing Whether Russell Was Able to Leave Her Home Without Assistance.

The ALJ erred in finding that Russell was not confined to her home, in part, because "[s]he could ambulate without an assistive device," and she was "able to go shopping with *minimal* assistance." (AR 18, emphasis added.) First, it appears from this and other statements in the ALJ's decision that the ALJ improperly neglected to consider whether, even assuming Russell was able to leave the home without an assistive device, she could leave the home without the assistance of another individual. Such consideration is required under 42 U.S.C. § 1395f(a), which states, in relevant part: "[A]n individual shall be considered to be 'confined to his home' if the individual has a condition . . . that restricts the ability of the individual to leave his or her home except *with the assistance of another individual* or the aid of a supportive device . . . ." (Emphasis added.) There is no discussion in the ALJ's decision regarding whether Russell *actually* left her home during the service period, and if she did, whether it was with the assistance of another individual.

Moreover, the ALJ's statement that Russell was able to go shopping "with minimal assistance" (AR 18) reveals the ALJ's application of an erroneous legal standard. The standard is not whether a claimant is able to leave the home with *minimal*

assistance; it is whether the claimant is able to leave the home with *no* assistance.  *See* 42

U.S.C. § 1395f(a).  A finding that Russell was able to leave the home "with minimal

assistance" equates to a finding that Russell required assistance to leave the home, which

should have led the ALJ to conclude that Russell met the first element of the two-part test

to determine whether a claimant is "confined to home" under the Medicare Act.  Instead,

the ALJ made the opposite conclusion, evidencing her use of an incorrect legal standard.

*See Colton v. Sec'y of Health and Human Servs.*, No. 90-CV-244, 1991 WL 350050, at *

5 (D. Vt. Jan. 30, 1992) (ALJ applied an "incorrect legal standard" in determining that a

Medicare beneficiary's condition was "relatively stabilized," where the subject

regulation's reference to "stabilization" was not qualified by the term "relatively").

### III.    The ALJ Neglected to Make a Finding Regarding the Frequency and Duration of Russell's Trips Outside the Home.

In determining whether a claimant was "confined to home" during the relevant

service period(s), the Medicare Act requires the ALJ to consider the frequency and

duration of the claimant's non-medical absences from his or her home during the service

period.  *See* 42 U.S.C. § 1395f(a) ("Any [non-medical] absence of an individual from the

home shall not so disqualify an individual if the absence is of infrequent or of relatively

short duration.")  Here, although the ALJ stated in her decision that Russell was "capable

of leaving the home for extended periods of time for nonmedically related activities, such

as shopping" (AR 18), the ALJ made no findings as to the frequency or duration of

Russell's actual trips outside the home during the service period.

In fact, there is no evidence in the record which demonstrates that Russell left her home frequently or for a long duration during the service period. As discussed above, nurse notes record that Russell left the home for shopping, visiting, and attending medical appointments; but they say nothing about how long or how frequent those trips were. The only direct evidence on the frequency and duration of Russell's trips outside the home during the service period is the Affidavits of Russell and Hojohn, which reveal that the only non-medical trips Russell took outside the home during the service period were trips to Shaw's and Big Lots with her sister, and dog walks with her sister. The evidence reveals that Russell's trips to the supermarket and Big Lots were both infrequent - once or twice a month to the supermarket and once a month to Big Lots - and short in duration - 30 to 60 minutes at the supermarket and 20 minutes at Big Lots - adding up to a total of less than two and a half hours a month spent outside the home shopping. (AR 25, 27.) The evidence further reveals that Russell and Hojohn's dog walks were very short in duration, as they walked only approximately 50 feet. (*Id.*)

In prior opinions, this Court has discussed and decided what types of absences are considered "infrequent" and of "relatively short duration," for Medicare purposes. In *Dennis v. Shalala*, No. 5:92-CV-210, 1994 WL 708166, at **4-5 (D. Vt. Mar. 4, 1994), for example, the Court found that the claimant was "homebound," despite taking nine trips to the grocery store during the seven-month service period. The Court explained:

> *Nor do [the claimant's] shopping excursions to the local grocery store disqualify her from homebound status.* Congress considered the "confined to home" designation to include claimants who had to leave home for medical purposes, as well as those who could . . . leave home for such non-medical purposes as an infrequent family dinner, *an occasional* drive or

*walk around the block*, or a church service. The obvious thrust is that the definition of "confined to home" should not serve to imprison the elderly by creating a penalty of loss of Medicare benefits for heroic attempts to live a normal life. [The claimant] shopped at the grocery store only nine times during the seven-month period at issue in this case; she should not lose her benefits merely because she has made an "heroic attempt" to engage in the activities of daily living.

Additionally, proposed federal regulations provide that *one non-medical outing per week is an insufficient basis on which to deny an individual homebound status*. In presenting regulations which define "confined to home," the Health Care Financing Administration has concluded that *an individual could have up to five non-medical absences per month and still be considered confined to home*:

> a beneficiary who leaves home only an average of five or fewer times in a calendar month (excluding absences to receive medical treatment which cannot be furnished in the home . . .) should still be considered to be confined to home. An average of five absences or fewer per calendar month would still enable a beneficiary to attend church regularly, or to attend an infrequent family dinner.

[The claimant] would meet this standard because the record indicates she shopped at the P & C only nine times during the seven month period. To that extent, the Secretary's determination that [the claimant's] trips outside the home exempted her from the definition of "confined to home" is not supported by substantial evidence.

*Id.* (internal quotations and citations omitted) (emphasis added).

In *Labossiere v. Sec'y of Health and Human Servs.*, No. 90-CV-150, 1991 WL 531922, at **3, 6 (D. Vt. July 25, 1991), on the other hand, the Court found that the claimant's shopping trips and attendance at an adult day care three to four days a week for up to eight hours at a time were frequent and regular. Likewise, in *Richardson v. Shalala*, No. 2:93-CV-387, 1995 WL 441956, at *3 (D. Vt. Jan. 27, 1995), where the claimant visited an adult day care three times a week for six hours at a time, the Court

found that the claimant was not homebound.  Finally, in *Pope v. Sec'y of Health and Human Servs.*, No. 89-CV-256, 1991 WL 236173, at *4, (D. Vt. Aug. 28, 1991), the Court affirmed the ALJ's determination that the claimant was not homebound, "based in part on her ability to leave home for periods of 1-4 hours at least once a week to shop, visit friends, attend church, and run errands."

In this case, unlike in *Labossiere*, *Richardson*, and *Pope*, the ALJ made no specific findings as to the duration and frequency of the trips Russell took outside the home during the service period.  Moreover, Russell's trips outside the home – which consisted of less than 2.5 hours per month spent food shopping for no longer than one hour per trip and 50-foot dog walks in nice weather – do not rise to the same frequency and duration as those involved in *Labossiere*, *Richardson*, and *Pope*, but rather, bear a more similar resemblance to the trips at issue in *Dennis*, where the claimant was found to be confined to the home.

## IV.    The ALJ's Determination that Russell's Trips Outside the Home Did Not Require "Considerable and Taxing Effort" is Not Supported by the Evidence.

Finally, the ALJ erred in determining that Russell's trips outside the home "did not require a considerable and taxing effort" (AR 18), without even mentioning (or ostensibly considering) the medical evidence stating that Russell was exhausted after her brief and infrequent trips to the supermarket and her 50-foot dog walks with Hojohn (*see, e.g.,* AR 525).  The ALJ stated in her decision that Russell's ability to leave home without exerting a considerable and taxing effort was supported by her "level of functionality and ability to travel without an assistive device."  (AR 18.)  But, as discussed above, although

Russell did not use an assistive device, there is evidence (not mentioned in the ALJ's decision) reflecting that Russell required another person's assistance to leave the home.

The ALJ also noted in her decision that Russell "was continent, had normal cognitive status, and was not short of breath."  (*Id.*)  Although the medical evidence supports these findings, there is additional medical evidence (again, not mentioned in the ALJ's decision) reflecting that Russell experienced fatigue, pain, nausea, and weakness during the service period.  (*See, e.g.,* 239, 285, 479, 503, 525, 527, 529, 533, 535, 539, 543, 569, 573, 587, 597, 603, 605, 609, 611, 816, 820.)  This probative medical evidence could support a finding that Russell's trips outside the home required "considerable and taxing effort," and thus, at least merited consideration in the ALJ's decision.  *See Dennis*, 1994 WL 708166, at *3; *Burgess*, 1993 WL 327764, at **6-7.

## Conclusion

Findings of fact made by the ALJ "are conclusive when supported by substantial evidence . . ., but are not conclusive when derived by ignoring evidence [or] misapplying the law . . . ."  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).  In this case, as discussed above, the ALJ ignored probative evidence and misapplied the applicable law.  Therefore, I recommend that Russell's Motion to reverse (Doc. 15) be GRANTED, and the Secretary's Motion to affirm (Doc. 21) be DENIED.  Because this case involves conflicting evidence, and resolution of conflicts in the evidence is for the ALJ and not the courts, *see Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981), I recommend REMANDING for further proceedings, if necessary, a re-weighing of the evidence, and another decision, consistent with this Report and Recommendation.

Dated at Burlington, in the District of Vermont, this 11th day of January, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


The parties are advised that any party may object to this Report and Recommendation **within fourteen (14) days** after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all other parties, a written objection which shall specifically identify the portion(s) of the proposed findings, recommendations, or report to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule waives the right to further appellate review of the District Court's order entered pursuant to this Report and Recommendation. *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a), and 6(d).